OPINION
{¶ 1} Plaintiff-appellant L. Patrick Mulligan appeals from a finding of, and sanction for, indirect criminal contempt arising from his double booking two trials for the same day and his failure to timely notify the Honorable A.J. Wagner, who was presiding over one of these trials, of the potential conflict. Mulligan argues that his conviction is not supported by sufficient evidence because intent cannot be inferred from his failure to proceed with one trial, when he was required to be in another court on a different matter. He also contends that he was denied due process of law, because he was without an impartial tribunal due to the court's personal animus against him. Mulligan finally claims that the court's imposition of certain additional sanctions regarding his future practice in front of the court is inappropriate.
 {¶ 2} We conclude that the record demonstrates sufficient evidence of Mulligan's intent to support his conviction. Intent may be inferred from an attorney's failure to notify the court in a timely manner of a potential trial conflict, coupled with other actions that led the court to conclude that the attorney, or an associate, would be available for trial when the attorney knew that neither he nor his associate would likely be in a position to try the case. But we also conclude that Mulligan was denied due process of law, because the trial judge became so personally embroiled in the controversy that his impartiality might reasonably have been doubted. Accordingly, we reverse the judgment of contempt, and remand this matter for proceedings before an impartial adjudicator. Our resolution of this argument moots Mulligan's final contentions relating to Judge Wagner's additional imposition of sanctions concerning Mulligan's future conduct.
 I {¶ 3} Mulligan, a criminal defense attorney, represented Derrick Glover in a criminal proceeding for a drug possession charge before Judge Wagner. The case was originally scheduled for trial on April 15, 2002, but was continued at the request of the prosecution. In January, 2002, the case was rescheduled for trial on May 6, 2002.
 {¶ 4} Another trial, where Mulligan was to act as defense counsel, was also set for May 6, 2002, before the Honorable Walter Rice in the United States District Court for the Southern District of Ohio, at Dayton. No notice was originally given to Judge Wagner regarding this potential conflict, because Mulligan thought that it would resolve itself if his federal client pled out or if another trial was given priority over this one on the federal docket.
 {¶ 5} Mulligan filed a witness list in his case before Judge Wagner on April 22, 2002. On that same day, Matthew Jewson, an associate in Mulligan's office, attended the final pre-trial conference. Nothing was said to Judge Wagner about the conflicting federal court trial date. On April 29, 2002, the conflict still existed, because the federal case was going forward. At that time, Mulligan prepared and had delivered a written motion for a continuance in Judge Wagner's case, which states as follows:
 {¶ 6} "The above captioned matter is currently scheduled to begin trial on May 6, 2002. Undersigned counsel is scheduled to begin a jury trial in Federal Court before Judge Rice, namely United States v. AnthonyMason. Undersigned counsel's associate is scheduled to begin a jury trial in Montgomery County Common Pleas Court before Judge Sunderland, namelyState of Ohio v. Eric Sealev. WHEREFORE, undersigned counsel requests that the trial in the above captioned cause be continued."
 {¶ 7} This motion was not filed with the Clerk of the Montgomery County Common Pleas Court. The motion, together with an entry, was delivered to Judge Wagner's chambers.
 {¶ 8} Judge Wagner became aware of the motion either on Tuesday, April 30, 2002, or on Wednesday, May 1, 2002. The court kept the motion in its file, neither filing it with the clerk nor entering any order denying the motion, because Judge Wagner learned that Jewson's conflicting case mentioned in the continuance motion had been resolved. Due to Judge Wagner's belief that Jewson could now try the Glover case, Mulligan received notice that the court was denying the motion.
 {¶ 9} On the morning of May 2, 2002, Jewson appeared before Judge Wagner and advised him that he could not try the Glover case because he had never really done anything on the Glover case, was unprepared, did not have the consent of the client to proceed, and concluded that it would be an ethical violation for him to try it.
 {¶ 10} The next day, a Friday, Mulligan received a call from Judge Wagner's bailiff indicating that the Glover trial was still going forward on May 6, 2002. But Mulligan could not go forward with the trial at this point because he had not discussed the case with Glover, picked up a jury list, or subpeonaed any witnesses, based upon his mistaken assumption that his motion for a continuance would be granted.
 {¶ 11} Mulligan then contacted the federal court, through a courtroom deputy, advising the deputy of the continuing trial conflict. The deputy then relayed this information to Judge Rice. Mulligan spoke to the federal court two to three times that evening. He then spoke to Judge Wagner, personally, Friday evening, explaining the continuing conflict, and renewing his request for a continuance. Judge Wagner denied this request and told him "that someone had better be present from [your] office on May 6 to try the case."
 {¶ 12} Saturday, May 4, 2002, Mulligan spoke with Judge Rice and reiterated the continuing conflict. He asked Judge Rice to contact Judge Wagner to see if the two judges could work it out, because he "figured that judges have a language and an understanding that perhaps lawyers don't have, and that the two of [them] would work it out."
 {¶ 13} Judges Wagner and Rice spoke that same day. Judge Rice informed Mulligan that he was to appear in front of Judge Wagner Monday morning at 8:30 A.M., and that he would then appear in federal court for trial at 8:45 A.M.
 {¶ 14} Mulligan appeared before Judge Wagner Monday morning. Judge Wagner granted the continuance and also ordered him to appear for a contempt hearing on May 17, 2002. Then, in the presence of his client, Judge Wagner made the following statement to Mulligan:
 {¶ 15} "I can't tell you how disappointed I am in you, upset I am with you. You have said time and again that your associate would not know Mr. Glover, yet he stood in for Mr. Glover * * * at previous conferences. You misrepresented yourself to this Court and caused numerous people much inconvenience and much delay * * *."
 {¶ 16} At the show-cause hearing, Judge Wagner called the prosecuting attorney in the Glover case to testify under oath, personally interrogating him. Judge Wagner also placed on the record his own version of the events surrounding the contempt charge, expressly finding that Mulligan, despite Mulligan's protestations to the contrary, had been present at the final pretrial conference. The court then found Mulligan guilty of contempt:
 {¶ 17} "I believe beyond a reasonable doubt that you were in contempt of this Court. I believe beyond a reasonable doubt that you have misbehaved, you had failed to timely advise this Court of your conflict, that you had deliberately double booked yourself and knew you wouldn't be prepared for something, but on April 22nd you filed your notice — your — your notice of witnesses indicating you were going to try this case."
 {¶ 18} The court sentenced Mulligan to a fine of two hundred dollars, a payment of costs, and imprisonment for two days at the Montgomery County Jail Day Reporting Program. The trial court also imposed an additional sanction:
 {¶ 19} "The Court: Next time we set a trial, it's going to be you, if you're going to be the one — if you're going to come in here and play the games, then you're going to be the one to try this stuff."
 {¶ 20} After Mulligan stated that he would appeal both the finding of contempt and the court's further sanction, Judge Wagner made a personal comment to Mulligan which the Court summarized as follows:
 {¶ 21} "* * * And a slightly heated exchange occurred. Mr. Mulligan advised that he would take that to the Court of Appeals as well, which is fine, and I made a snippy comment, probably inappropriate when I said well, that's fine * * * I hope you look good in an orange suit."[1]
 {¶ 22} From the finding and sanction for contempt, Mulligan appeals.
 II {¶ 23} Mulligan's first assignment of error is as follows:
 {¶ 24} "THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING ATTORNEY MULLIGAN GUILTY OF INDIRECT CRIMINAL CONTEMPT IN THE ABSENCE OF INTENT TO DEFY THE COURT"
 {¶ 25} Mulligan contends that the State presented insufficient evidence to convict him of indirect contempt, because there was no showing that he had any intent to obstruct justice. He argues that attorneys, like courts, must often double book hearings, and doing so does not constitute a showing of intent for contempt purposes. We disagree.
 {¶ 26} R.C. 2705.02 sets forth acts that are considered to constitute an indirect contempt of the court, including the following:
 {¶ 27} "A person guilty of any of the following acts may be punished as for a contempt:
 {¶ 28} "* * *
 {¶ 29} "(B) Misbehavior of an officer of the court in the performance of official duties, or in official transactions * * *."
 {¶ 30} Here, the contempt proceeding involves the imposition of a penalty and is criminal in nature. State v. Searles (Mar. 28, 1991), Cuyahoga App. No. 58087. Thus, the elements of the charge must be proven beyond a reasonable doubt. Id. Because the charge stems from actions occurring outside the presence of the court and involves indirect contempt, intent to defy the court must also be established. Id.
 {¶ 31} To reverse Mulligan's criminal conviction under R.C. 2705.02
for insufficient evidence, we must conclude, after reviewing the evidence in a light most favorable to the State, that no rational trier of fact could have found beyond a reasonable doubt that Mulligan's actions intentionally constituted misbehavior in the performance of his duties or transactions as an attorney practicing before the court. State v.Thompkins, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541. With this standard in mind, we now address his first assignment of error.
 {¶ 32} In State v. Weiner (1974), 37 Ohio St.2d 11, 305 N.E.2d 794,797, the Court explained:
 {¶ 33} "Where an attorney has been retained as counsel and received payment from a defendant in a misdemeanor case, a jury trial has been scheduled pursuant to that attorney's request, he has notice of the time of trial, and the jury is in fact impaneled and awaiting the start of the trial, his failure to directly notify the court of his intention to absent himself from the trial at so late a date as to leave the court no time to make alternate arrangements is clearly contumacious."
 {¶ 34} Mulligan argues that Weiner does not govern the outcome in this case because of the existence of sound reasons, namely the federal trial scheduled for the same time, for his failure to proceed with trial in Judge Wagner's chambers. He also maintains that there is insufficient evidence of intent for contempt purposes, under R.C. 2705.05, because he was not reckless or wilful, just mistaken in his belief that the federal case would settle. He appears to believe that his mistaken assumptions regarding a scheduling conflict cannot constitute intentional behavior. In support of this argument, he cites Searles, supra, and Pietz v. Penix
(Dec. 16, 1994), Lucas App. No. L-94-030. Mulligan finally concludes that because he filed a motion for continuance a week prior to the trial, this should have given the court enough time to make alternate arrangements.
 {¶ 35} We disagree with his contentions. "[A] person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts." In re Purola (1991), 73 Ohio App.3d 306, 312,596 N.E.2d 1140, 1144 (attorney's failure to make a timely effort to inform the court of a potential scheduling conflict coupled with his resignation from the case, which was delivered to the court just three days before a scheduled pretrial conference, constitutes sufficient evidence of intent for conviction purposes under R.C. 2705.02). The natural and probable consequence of Mulligan's failure to notify Judge Wagner of the scheduling conflict until just a few days prior to the trial obstructed the administration of justice. Especially in light of Mulligan's decision to file a witness list, coupled with his continuance motion, which implied that his associate, Jewson, could handle the matter but for his conflicting trial date in Judge Sunderland's court. After that case settled, Judge Wagner reasonably concluded, based upon the wording of Mulligan's continuance motion that the trial could go forward, with Jewson acting as trial counsel. Mulligan, as an officer of the court, could hardly have been unaware of the obstructive effect of his conduct on the operation of the court. Mulligan's intent does not arise from a single act. Rather, the intent required for a contempt conviction under R.C. 2705.02 can be found by viewing the totality of circumstances leading up to May 6, 2002.
 {¶ 36} Moreover, Mulligan's reliance upon Searles, supra andPietz, supra, is misplaced. Unlike Searles, where an attorney unwittingly communicated with a juror, the evidence here demonstrates that Mulligan knew a conflict existed, but failed to notify Judge Wagner due to Mulligan's belief that he could resolve the federal conflict while keeping the state court trial date. His actions appear to be anything but unwitting. Likewise, we do not find Pietz instructive. In that case, the appellate court refused to find intent where a lay defendant failed to comply with an order of the court and failed to notify the court of his inability to comply with that order. This case differs from the one before us because the Pietz defendant was not an attorney, and could not be charged for misbehavior as an officer of the court. As an experienced trial attorney, Mulligan should have recognized the potential trial conflicts and made the court aware of them as soon as they came into being, so that the trial court could evaluate the risk that Mulligan's case in that court might not be able to go forward, and have the benefit of that evaluation in deciding to which of several cases to give priority. Furthermore, Mulligan should not have filed documents before the court implying, by silence, that he knew of no impediment to the trial proceeding as scheduled, when he knew that there was a substantial impediment, in the form of a conflicting trial date in federal court.
 {¶ 37} At oral argument, Mulligan repeatedly urged this court not to permit attorneys to be punished for double booking cases before courts, because clients should be able to choose their attorneys and should not be limited due to the fact that the best attorneys would be unable to take cases if they cannot engage in this type of behavior. This argument fails to recognize the real issue in this case. Even if attorneys are justified in double booking appearances before courts, they may only do so if they put each judge on timely notice of potential scheduling conflicts before they lead to situations like the one before us today. Each trial judge has responsibility for his court's docket. Courtroom trial dates are a scarce resource, and trial counsel have an obligation to keep trial judges informed, on a timely basis, of circumstances that impact the trial judge's decision how best to allocate that resource, without winding up with a wasted trial day, or days, that could easily be avoided if the trial judge were made aware, at an earlier time, of a scheduling conflict.
 {¶ 38} In this case, we cannot conclude that no rational trier of fact could have found beyond a reasonable doubt that Mulligan's actions intentionally constituted misbehavior in the performance of his duties or transactions as an officer of the court. Accordingly, Mulligan's first assignment of error is overruled.
 III {¶ 39} Mulligan's second assignment of error states as follows:
 {¶ 40} "THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO AFFORD DUE PROCESS RIGHTS REQUIRING A PRESUMPTION OF INNOCENCE, AND THE RIGHT TO AN IMPARTIAL AND UNBIASED JUDGE"
 {¶ 41} Among other reasons Mulligan offers for reversing the judgment of contempt is Judge Wagner's dual role as prosecutor and judge at his contempt hearing.[2] He contends that the judge's dual capacity denied him due process of law. Based upon our review of this record, we conclude that Mulligan was denied due process of law, i.e., the right to an impartial and unbiased judge, by being tried and sentenced by the same judicial officer who actively prosecuted the case against him.
 {¶ 42} As explained in Weiner, supra:
 {¶ 43} "[T]he appointment of another judge to hear the evidence is warranted where the alleged contempt takes the form of personal insult or vilification of the judge, so that there would exist the possibility of bias should the victim of such abuse pass judgment on the evidence * * *."
 {¶ 44} Likewise, as explained by the United States Supreme Court in Taylor v. Hayes (1974), 418 U.S. 488, 501, 94 S.Ct. 2697, 2704,41 L.Ed.2d 897 (internal citations omitted):
 {¶ 45} "[C]ontempuous conduct, though short of personal attack, may still provoke a trial judge and so embroil him in controversy that he cannot `hold the balance nice, clear, and true between the state and the accused' * * * In making this ultimate judgment, the inquiry must be not only whether there was actual bias on [the judge's] part, but also whether there was `such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused.' * * * `Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties,' but due process of law requires no less."
 {¶ 46} Although it is perhaps preferable that another judge always decide the merits of a charge of indirect contempt made by a judge, there is nothing wrong with the charging judge deciding the merits of the contempt charge, provided that he or she can be an impartial arbiter. SeeState v. Weiner (1974), 37 Ohio St.2d 11.
 {¶ 47} Facts suggesting that a judge may have become so personally embroiled that his perspective may be affected include complaining to the attorney's fellow professional colleagues and clients about the events leading up to the contempt proceedings. Betsworth v. Worker's Comp.Appeals Bd. (1994), 31 Cal Rptr.2d 664 (contempt judgment based upon attorney's personal disrespect towards worker's compensation referee annulled because referee became so personally embroiled in the incident that her perspective was affected, and in the process denying defendant due process of law).
 {¶ 48} Although it is not per se improper for the charging judge, while acting as the adjudicator of the charge, to call witnesses, or even to be a witness to undisputed facts, these actions may be considered, together with other facts and circumstances, in determining whether a judge has become so personally invested in the outcome of a contempt proceeding that the judge's impartiality, or the appearance thereof, is compromised.
 {¶ 49} With these considerations in mind, we have examined the record, and it does appear that Judge Wagner became embroiled in a running dispute with Mulligan.
 {¶ 50} On May 6, 2002, Judge Wagner began to display an unfavorable personal attitude towards Mulligan and his motives by making the following comments to Mulligan in front of his client after ordering him to appear for a show cause hearing as to why he should not be found in contempt for his actions in the Glover matter:
 {¶ 51} "I can't tell you how disappointed I am in you, upset I am with you. You have said time and again that your associate would not know Mr. Glover, yet he stood in for Mr. Glover * * * at previous conferences. You misrepresented yourself to this Court and caused numerous people much inconvenience and much delay * * *. I emphasize how many people you've inconvenienced in this matter. And you may think this doesn't cost anybody any money, but it does. It costs all the citizens of Montgomery County a considerable amount of money. It costs all the citizens of those jurisdictions where the police come from considerable amounts of money."
 {¶ 52} By the time of the contempt hearing, it became apparent that the issue should be heard by another judge, as evidenced by just a few of the exchanges between Judge Wagner and Mulligan:
 {¶ 53} "The Court: Actually did you set Judge Rice's case after this case was set? This case was set on January 24th —
 {¶ 54} "Mr. Mulligan: I don't know that.
 {¶ 55} "* * *
 {¶ 56} "The Court: Right? Well, I'll continue this hearing. I'll subpoena the Federal people over and we'll find out, okay?
 {¶ 57} "Mr. Mulligan: That's fine.
 {¶ 58} "The Court: I mean, this is just outrageous. This is just unbelievably outrageous. Did you docket me first or did you docket him first?
 {¶ 59} "Mr. Mulligan: I don't know the answer to that question.
 {¶ 60} "The Court: But you did double docket?
 {¶ 61} "Mr. Mulligan: Double docketing happens every single week in our office.
 {¶ 62} "The Court: Well, it shouldn't then.
 {¶ 63} "Mr. Mulligan: Every week.
 {¶ 64} "The Court: It shouldn't.
 {¶ 65} "Mr. Mulligan: It shouldn't.
 {¶ 66} "The Court: Then you're taking in too many cases.
 {¶ 67} "Mr. Mulligan: I would respectfully disagree.
 {¶ 68} "The Court: Well —
 {¶ 69} "Mr. Mulligan: Because I know that this Court does it.
 {¶ 70} "* * *
 {¶ 71} At one point, Judge Wagner went so far as to offer his own, unsworn testimony:
 {¶ 72} "The Court: You were here for a final pretrial that morning in my chambers. Are you saying you weren't here?
 {¶ 73} "Mr. Mulligan: Well, I don't have that written down, so I'm reluctant at this point to say that I was at someplace that I did not write down.
 {¶ 74} "The Court: Okay. Then — then suffice it to say, my testimony will have to do on that. My statement will have to do. You were here, nobody brought it up * * * Well, I can assure you you were here. I can assure you you were here."
 {¶ 75} At another point, Judge Wagner called Larry Lasky, attorney for the State in the Glover trial, to testify and proceeded to question him.
 {¶ 76} Judge Wagner also made several references to the disrespect Mulligan showed towards him and towards the entire criminal justice system:
 {¶ 77} "The Court: * * * You not only disrespected me, Mr. Mulligan, you disrespected the witnesses, you disrespected the jury, you disrespected the citizens of this county and this state."
 {¶ 78} Further trouble ensued, even after the conclusion of the hearing, as demonstrated by the following statement by the Court:
 {¶ 79} "After we went off the record, the hearing, I also advised Mr. Mulligan that he would be required in the future in this Court to represent if he's — if his name is on the pleading, that he will represent his clients to prevent this from ever happening again, and if he wants to do it this way, then we will make sure that only he can represent the clients, he cannot send his associates over to represent the clients. That way there's no confusion as to who represents the clients, and that he will make sure that he's not double booked on the days that I have his — him here in court. I will put that in writing. I'll put that in the order, I informed him. And a slightly heated exchange occurred. Mr. Mulligan advised that he would take that to the Court of Appeals as well, which is fine, and I made a snippy comment, probably inappropriate when I said well, that's fine, I hope you enjoy — I'm sorry, Mr. Jewson, you heard it, what exactly did I say?
 {¶ 80} "Mr. Jewson: I heard it because Mr. Mulligan was walking out the door and it was yelled at our backs, it was, I hope you look good in an orange suit.
 {¶ 81} "The Court: Thank you, and I said that.
 {¶ 82} "Mr. Jewson: And I don't — I didn't hear the rest of it.
 {¶ 83} "The Court: And I did say that.
 {¶ 84} "Mr. Jewson: It was made with a lot of emotion, in anger while you were standing apparently at the bench, and I — and I believe there was no response that was inappropriate or unjust by any way from me. I haven't said a thing during this entire hearing. I — I don't know why I was really directed to go outside the room, but then Mr. Mulligan's walking out.
 {¶ 85} "The Court: Okay. Mr. Jewson heard it, I — Mr. Mulligan, it was directed at you, not at Mr. Jewson, of course, and it was directed in anger, and for that, I apologize, I should watch my temper.
 {¶ 86} "* * *
 {¶ 87} "Mr. Mulligan: * * * [I]f this Court harbors animosity towards me, then I suggest that we get together sometime, go to a baseball game or have a beer, or whatever is appropriate, to get that out of the way, because I don't harbor any towards you. So I — I am floored, I don't know where that came from. I — I don't know what I ever could have possibly done to justify that and —
 {¶ 88} "The Court: Mr. Mulligan, I don't think you — you probably don't grasp my mind. My own concern for inconveniencing through this system, this system is — is — is onerous to — to — to those who have to participate in it, especially those who are not members of the Court, and when we inconvenience fifty jurors and drag them here off the street, it's the only conscription law we have left, and we drag them in here off the street so that they can help us out for a trial and they take their days off work and they — and their employment and their employees — their employers stuff and — and — and they suffer some great inconvenience for having to do it and we pay them minimally, and — and then we say, whoops, our mistake, you can go home. When we drag witnesses in here by Court order and say, you've got to be here that Monday and — and then we say, well, the attorney didn't want to be here, so, whoops, our mistake, he double booked, sorry, you can go home.
 {¶ 89} "* * *
 {¶ 90} "The Court: * * * I'm trying to explain to you is how angry it makes me that we inconvenience dozens of citizens and dozens of people because you've double booked, and you may not mean any disrespect.
 {¶ 91} "Mr. Mulligan: None, and I know not everyone does.
 {¶ 92} "The Court: But you're double booking. The way you're proceeding absolutely does cause disrespect. It causes the forty — how many people were here that — that day? There were forty some that day.
 {¶ 93} "Unidentified Speaker: Forty-eight.
 {¶ 94} "The Court: Forty-eight people here that morning for jury trial and — and there were forty some. It was — it was a high number showed up that day.
 {¶ 95} "* * *
 {¶ 96} "The Court: They were here for a jury trial that did not happen. There were something like ten or fifteen witnesses called and it did not happen and you can't simply say, oh, I double booked, sorry."
 {¶ 97} That Judge Wagner had a strong emotional reaction to Mulligan's actions is evident from the record. Mulligan's motion for a stay of his sentence pending appeal was reflexively denied, for example. Because Mulligan was constitutionally entitled to be tried in front of a judge not personally embroiled in the controversy, but was not, Mulligan's second assignment of error is well-taken.
 {¶ 98} Mulligan's second assignment of error is sustained.
 IV {¶ 99} Mulligan's third assignment of error provides as follows:
 {¶ 100} "THE TRIAL COURT ABUSED ITS DISCRETION IN SENTENCING ATTORNEY MULLIGAN BY IMPOSING SANCTIONS ANTICIPATING FUTURE CONTEMPTS"
 {¶ 101} Our disposition of Mulligan's second assignment of error renders his third assignment of error moot. App.R.12(A).
 V {¶ 102} Mulligan's second assignment of error having been sustained, his first assignment of error having been overruled, and his third assignment of error having been overruled as moot, the judgment of the trial court is Reversed, and this cause is Remanded for proceedings upon the contempt charge before a different judicial officer, consistent with this opinion.
WOLFF, and YOUNG, JJ., concur.
[1] The exchange to which Judge Wagner refers was not itself on the record, the contempt hearing having evidently been completed, at least for record purposes, before the exchange, and then having been reopened after the exchange, apparently for the commendable purpose of memorializing the exchange accurately in the record.
[2] From our review of the videotape of the contempt hearing, we conclude that it would be fair to add the role of witness to the multiplicity of roles that the trial judge played at the hearing.